IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  07-cv-00200-WYD-MJW

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, a Wisconsin insurance
company,

      Plaintiff,

v.

TEAMCORP., INC., a Colorado corporation, d/b/a LACONIA HOMES AND
DRAFT-TEK or Draft-Tech;
KERRY KARNAN;
PLATT T. HUBBELL;
KELLEY S. HUBBELL; and
THANE LINCICOME;

      Defendants.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

I.    <u>INTRODUCTION</u>

      THIS MATTER comes before the Court on Plaintiff's Motion for Summary

Judgment (Revised Pursuant to February 10, 2009 Order (Doc. # 165)), Defendants

Teamcorp. Inc. d/b/a Laconia Homes/Draft-Tek and Kerry Karnan's Motion for Partial

Summary Judgment Regarding Plaintiff's Duty to Defend, and the Hubbells' Motion for

Partial Summary Judgment Re: American Family's Duty to Defend Teamcorp, Inc. and

Karnan.  The motions relate to whether Plaintiff has a duty to defend Defendants under

a Commercial General Liability ["CGL"] policy in connection with an underlying action

filed by Platt and Kelley Hubbell [the Hubbells"] against the Defendants.

II.   <u>BACKGROUND</u>

This is an anticipatory declaratory judgment action by American Family Mutual

Insurance Company ["AmFam"] seeking a declaration of the parties' rights under the

CGL policy issued by AmFam to "Laconia Homes, Inc." and later by endorsement to

"Teamcorp., Inc. d/b/a Laconia Home and Drafttech [sic]".  The Amended Complaint

asserts claims for declaratory judgment of no coverage, recovery of defense costs

incurred in defending Teamcorp, Inc. ["Teamcorp"] in an Amended Third-Party

Complaint filed by the Hubbells, and a declaration that Thane Lincicome ["Lincicome"]

was not an insured person under the AmFam policies issued to Teamcorp.

In the underlying Third-Party Complaint the Hubbells have asserted certain

claims for relief against Teamcorp, Lincicome and Kerry Karnan ["Karnan"] [collectively,

"the Teamcorp Defendants"] in a liability suit pending in this Court before Judge

Arguello, Case No. 05-cv-00026-CMA-KLM, entitled *Alpine Bank v. Platt T. Hubbell, et*

*al. v. Carney Brothers Construction, et al.* [hereinafter "the underlying action"].  The

issues have not been resolved in that case, and AmFam is defending Teamcorp and

Karnan in the case under a reservation of rights.

Judge Figa, who previously resided over this case, ruled in an Order dated

October 16, 2007, that this anticipatory declaratory judgment action can be pursued by

AmFam in connection with the duty to defend.  Accordingly, he declined to stay this

portion of the case.  Such an action appears to be appropriate for the reasons stated by

Judge Figa and because (1) AmFam "asserts in good faith that its contract of insurance,

as a matter of law, does not afford a duty to defend the Teamcorp Defendants in the

underlying tort action, whom AmFam has undertaken to defend while the anticipatory declaratory judgment action is being resolved; and (2) the persons affected by resolution of coverage questions are parties to the underlying action and to the anticipatory declaratory judgment action." *See Progressive Cas. Ins. Co. v. Herring*, 22 P.3d 66, 67-68 (Colo. 2001). Thus, to the extent the TeamCorp Defendants argue in their motion for partial summary judgment that the appropriate course of action is for AmFam to seek a declaratory judgment after the underlying action has been adjudicated and that this anticipatory suit is improper, these arguments are denied.

I note that the summary judgment motions at issue were filed after previous motions were stricken by me by Order of February 10, 2009, because they improperly cited to and/or addressed extrinsic evidence in violation of the "four-corners" rule (also referred to as the complaint rule) for determining the duty to defend. Under that rule, the duty to defend focuses on an examination of the allegations in the complaint, not by looking to facts beyond the allegations of the complaint. *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 621 (Colo. 1999); *Gen. Security Indem. Co. v. Mountain States Mut. Cas.*, 205 P.3d 529, 532 (Colo. Ct. App. 2009); *see also* Order of February 10, 2009, at 5-6.

III.   FACTS

Turning to the complaint allegations, the underlying suit for which Teamcorp and Karnan seek coverage is the Amended Third-Party Complaint filed by the Hubbells against Teamcorp, Karnan and others in the underlying case before Judge Arguello, which Complaint is attached as Exhibit 1 to Plaintiff's Motion for Summary Judgment.

The original Third-Party Complaint was filed June 11, 2005, and an Amended Third-Party Complaint is now the operative compliant in the action.

The Amended Third-Party Complaint contains the following allegations:

(a)   Teamcorp, Inc. d/b/a Draft-Tek is a Colorado corporation that was at all relevant times duly authorized to conduct business in the State of Colorado.  (Pl.'s Mot. for Summ. J., Ex. 1, ¶ 5.)

(b)   "In January 2003 the Hubbells entered into a contract with [Carney Brothers Construction or "CBC"] to construct a single family home of approximately 6,000 square feet along with a 3,100 square foot garage and apartment" (the subject property).  (*Id.*, ¶ 11.)

(c)   CBC, the contractor, recommended that the Hubbells hire Draft-Tek to complete the plans and specifications for the project, and the Hubbells did so.  "The Hubbells relied on CBC's recommendations" to hire Draft-Tek. (*Id.*, ¶ 14.)

(d)   "Draft Tek is not a licensed architect, and none of its principals during the relevant time were licensed architects."  (*Id.*, ¶ 16.)  "Kerry Karnan, the principal of Draft-Tek who participated in the design of Hubbells' home, is not a licensed engineer."  (*Id.*, ¶ 17.)

(e)   Draft-Tek hired Lincicome, a licensed professional engineer, to perform and/or approve the structural specifications for the residence.  Lincicome reviewed and approved such specifications and affixed his official stamp on the construction plans tendered to the Hubbells and CBC.  (*Id.*, ¶ 18.)

(f)   Lincicome normally reviews drawings prepared by others who work at Draft-Tek, but does not normally perform structural design for Draft-Tek. (*Id.*, ¶ 19.)  Prior to designing the Hubbells' home, Lincicome had never designed or reviewed the structural design of a building as complex as the Project.  (*Id.*, ¶ 20.)

(g)   Draft-Tek has no full time employees that are licensed engineers.  (*Id.*, ¶ 21.)

(h)   Draft-Tek and Karnan did not perform an adequate investigation to determine whether Lincicome was qualified to perform or review the structural design of the Project.  (*Id.*, ¶ 22.)

(i)    "Construction of the Project began in and around May 2003." (*Id.*, ¶ 24.)

(j)    "Prior to the start of construction, CBC represented to the Hubbells that all necessary building permits had been obtained.  The Hubbells called Alpine Bank and indicated that Richard Carney would be dropping off copies to the Bank.  The Hubbells justifiably relied upon the fact that the Bank would not disburse any loan proceeds unless the necessary building permits had been issued.  Despite the fact that the Bank never received the necessary building permits, it nevertheless disbursed over $75,000 in loan proceeds to the Project." (*Id.*, ¶ 25.)

(k)    "In and around the last quarter of 2003, the Hubbells became concerned about the progress of the construction and the escalating costs.  There were problems with the plans and specifications.  The Hubbells asked whether they should get an architect involved in the Project, but were once again told that was not necessary by CBC.  There were several meetings with CBC, Ian Carney, and Alpine Bank attempting to resolve the issues.  When those problems relating to the Project were brought to the attention of Alpine Bank, the Hubbells were advised by the Bank to stay with CBC because CBC 'would make it right.'  At the time the Bank made these statements, it knew or had reason to know that there were significant problems with CBC and it had a duty to the Hubbells to make full disclosure of the facts it knew about the fraudulent and improper practices of CBC." (*Id.*, ¶ 31.)

(l)    "[T]he Hubbells orally terminated CBC's contract on December 11, 2003." (*Id.*, ¶ 33.)

(m)    "On December 12, 2003 Platt Hubbell was on site when an inspector from the Garfield County Building Department visited the construction site and stopped work on the project because CBC, despite having a contractual obligation to do so, never obtained a building permit.  Ian Carney admitted to the inspector that CBC 'haven't got any' building permits for the project.  Platt Hubbell also discovered that the location of the residence had never been properly 'sited' on the Property." (*Id.*, ¶ 34.)  "Although over almost two-thirds of the construction loan had been disbursed by the Bank as of December 2003 for the Project, it was less than one-third complete." (*Id.*, ¶ 36).

(n)    "The Hubbells thereafter hired a licensed architect and professional engineer to inspect the structure and report the condition and quality of the construction along with estimated costs to complete." (*Id.*, ¶ 35.)

(o)     "The architect and professional engineer concluded, among other things, that the residence had never been sited on the Property nor had an appropriate site plan been filed with Garfield County; the structure significantly violated both Garfield County and subdivision height restrictions; the structure had not been built according to the Draft-Tek plans; the foundation had not been properly poured; the Draft-Tek plans were deficient and did not comply with applicable building codes; and the residence, if completed according to the plans, would be structurally unsound and therefore uninhabitable. The architect and the structural engineer both opined that corrective measures would be cost prohibitive and that there was no guaranty that they would adequately remedy the many problems. Indeed, they believed it may be more cost effective to demolish the existing structure and rebuild it than to attempt corrective measures." (*Id.*, ¶ 37.)

(p)     "Third-Party Defendants CBC, Ian Carney, Richard Carney, Draft-Tek, Lincicome and Karnan designed and engineered the residence on the Property for the Hubbells. Third-Party Defendants CBC and T.J. Concrete constructed the improvements. Third-Party Defendants Ian Carney and Richard Carney also personally participated in the construction of the improvements." (*Id.*, ¶ 39.)

(q)     "CBC, Ian Carney, Richard Carney, Draft-Tek, Lincicome, T.J. Concrete and Karnan owed a duty of care to the Hubbells to perform their design and construction services in a competent and workmanlike manner and in compliance with applicable industry standards." (*Id.*, ¶ 40.)

(r)     "CBC, Ian Carney, Richard Carney, Draft-Tek, Lincicome, T.J. Concrete and Karnan have breached their respective duties of care causing injury and damages to the Hubbells." (*Id.*, ¶ 42.)

(s)     The negligence of the defendants, including Defendants Draft-Tek and Karnan, was the actual and proximate cause of the Hubbells' damages. (*Id.*, ¶ 43.)

(t)     The Hubbells entered into a contract with Draft-Tek in which it agreed to provide plans sufficient to construct the Hubbells' home. (*Id.*, ¶ 57.)

(u)     "Draft-Tek breached its contract with the Hubbells producing deficient plans that do not comply with applicable building codes and that would, if followed, result in a structurally unsound and uninhabitable structure." (*Id.*, ¶ 58.)

(v)    "The Hubbells justifiably relied on the misrepresentations of Draft-Tek, Karnan and Lincicome." (*Id.*, ¶ 78.) "As a direct and proximate result of the misrepresentations of Draft-Tek, Karnan and Lincicome, the Hubbells have suffered damages in an amount to be proven at trial." (*Id.*, ¶ 79.)

The Hubbells asserted three causes of action against Teamcorp:  negligence, breach of contract, and negligent misrepresentation.  In regard to their negligence claim, they contend that Teamcorp owed a duty of care "to perform their design and construction services in a competent and workmanlike manner and in compliance with industry standards," that Teamcorp owed a duty of care to hire people or firms that "were competent and qualified to perform the design work in compliance with industry standards," and that Teamcorp breached its duties "causing injury and damages to the Hubbells." ((Pl.'s Mot. for Summ. J., Ex. 1, ¶¶ 40-42.)

The Hubbells' breach of contract claim asserts that Draft-Tek breached its contract by "producing deficient plans that do not comply with applicable building codes and that would, if followed, result in a structurally unsound and uninhabitable structure." (*Id.* at ¶ 58.)  Lastly, the Hubbells assert that Teamcorp, Karnan and Lincicome negligently misrepresented that "they were capable of designing and reviewing the design of the Hubbells' home." (*Id.* at ¶ 74.)  As a result of the misrepresentations, "the Hubbells have suffered damages in an amount to be proven at trial." (*Id.* at ¶ 79.)

There are no allegations that Karnan, Draft-Tek or Lincicome participated in the construction of the project as opposed to the design and engineering of the project.  The Amended Third-Party Complaint also does not allege that Teamcorp or Karnan expected to intended to cause property damage (or damages in general) to the

Hubbells' land or to the house under construction.  Further, it does not allege that

Teamcorp, Karnan or Lincicome did any act or failed to do any act at the Property itself

or in the actual construction of the home.

Finally, the Amended Third-Party Complaint does not sue, and does not mention,

"Laconia Homes" or "Laconia Homes, Inc."  However, Defendant Teamcorp is a

Colorado corporation which has done business under the names of "Laconia Homes"

and "Draft-Tech" (or Draft-Tek).  (Am. Fam's Amended Complaint For Declaratory

Relief, ¶ 2.)  Teamcorp has conducted the business of erecting pre-manufactured

housing under the names "Laconia Homes."

As to the policy at issue, AmFam issued a policy number 05-XE6895 to the

named insured "Laconia Homes, Inc," a corporation, with an inception date of February

2, 2003.  (Pl.'s Mot. for Summ. J., Ex. 2, excerpt of certified copy of the policy, pp. 1, 4.)

The policy includes "Commercial General Liability Coverage".[1]

After a lapse in coverage, the policy was reissued, again to "Laconia Homes,

Inc.," now bearing policy number 05-XE6895-02, for a policy period of August 5, 2003 to

August 5, 2004.  (Id., Ex. 3 at 1, 5).  Both versions of the policy identify the named

insured's "Form of Business" as a "Corporation," and the named insured's "Business

Description" as "MFG Home Erection."  (Id., E.x. 2 at p. 4, Ex. 3 at p. 5.)

Throughout the Policy, the terms "you" and "your" refer to the Named Insured

shown in the Declarations and any other person or organization qualifying as a Named

---

[1]  Although AmFAm asserts that the Policy was issued based upon an Application taken by Jim
Lord and completed by Tiffany Singleton, I agree with Defendants and the Hubbells that this is improper
extrinsic evidence.  Thus, I will not consider it in connection with resolution of the pending motions.

Insured.   Section II of the CGL form identifies "Who is an Insured."  When a corporation, *i.e.*, "organizations other than a partnership, joint venture or limited liability company", is designated as the Named Insured, it is an insured.  In addition, the Policy provides, "Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders." (Hubbell's Mot. For Partial Summ. J. Re: American Family's Duty to Defend Teamcorp, Inc. and Karnan [hereinafter "Hubbells Mot. for Partial Summ. J."],  Ex. A-1, at AmFam0314, Section II, (1)(d).)

During this policy period, an Endorsement was added to the reissued policy, effective May 13, 2004, that changed the name of the named insured from "Laconia Homes, Inc." to "Teamcorp, Inc. d/b/a Laconia Home and Draftech [sic]"  (*Id.*, Ex. 3 at p. 2).[2]  The Policy provides, "Any endorsement made a part of this policy, whether at the time of issue or during the policy period, amends the terms of the policy. Where the policy terms differ from similar terms in any endorsement, the endorsement will prevail. All other terms remain unchanged."  (*Id.*, Ex. A-1 at AmFam0307.)

Teamcorp, Inc. d/b/a Draft-Tek and Karnan since have tendered the defense of the Hubbells' Third-Party claims to AmFam under the policy.  (AmFam Complaint for Declaratory Relief ¶ 23, and Answer of Teamcorp, Inc. d/b/a Laconia Homes and Draft-Tek, and Kerry Karnan, Individually, dated May 14, 2007, ¶ 23 (admitting tender of

---

[2]   AMFam asserts that this endorsement was done because on or about May 11, 2004, AmFam insurance agent Jim Lord ["Lord"] was contacted by Craig Snow on behalf of Teamcorp.  Snow requested to Lord that the named insured shown on the Policy be changed from "Laconia Homes, Inc." to "Teamcorp, Inc., d/b/a Laconia Homes and Draft-Tek." (Pl.'s Mot. for Summ. J., Ex. 4, Lord Deposition at 36.)  Defendants and the Hubbells object to this fact as extrinsic evidence.  I agree that this is extrinsic evidence that will not be considered in connection with my decision on the summary judgment motions.

defense)).  The "Commercial General Liability Coverage Part Declarations" of the Policy identifies the "Classifications" of the business activities of the insured as the following: "91583, Contractors-Subcontracted Work-In Connection With Building Construction, Reconstruction, Repair or Erection – One or Two Family Dwellings" and 98502, "Prefabricated Building Erection."  (Pl.'s Mot. for Summ. J., Ex. 2 at 6, Ex. 3 at 7.)

The "Commercial General Liability Coverage Form" of the Policy contains the following terms and provisions:

Insuring Agreement

a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

* * *

b.      This insurance applies to . . . "property damage" only if:

(1)     The . . . "property damage" is caused by an "occurrence". . .

(2)     The . . . "property damage" occurs during the policy period; . . .

(*Id.*, Ex. 2, at p. 18, Ex. 3 at p. 9. Section I(A)(1)).  An "occurrence" is defined in the Policy as "…an  accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Hubbells' Mot. for Partial Summ. J., Ex. A-1 at AmFam 0318.)

The Policy contains exclusions that exclude from coverage the following:

**j.    Damage to Property**

Property Damage to:

(5)    That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations; or

(6)    That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**m.    Damage to Impaired Property or Property Not Physically Injured**

'Property damage' to 'impaired property' or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'; or

(2)    A delay or failure by you or anyone action on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work after it has been put to its intended use.

(Pl.'s Mot. for Summ. J., Ex. 2, p. 10; Hubbells' Mot. for Partial Summ. J., Ex. A-1,

AmFam 0308, 0310, 0311.)

The Policy contains the following additional Definitions:

8.    "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

a.    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b.      You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a.      The repair, replacement, adjustment or removal of "your product" or "your work;" or

b.      Your fulfilling the terms of the contract or agreement.

16.     "Products-completed operations hazard:"

a.      Includes all "bodily injury" and "property damage" incurring away from premises you own or rent and arising out of "your product" or "your work" except:

* * *

(2)     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a)     When all of the work called for in your contract has been completed.

(b)     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c)     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

17.     "Property Damage" means:

a.      Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      b.     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

21.    "Your Work"

      a.     Means:

          (1)     Work or operations performed by you or on your behalf; and

          (2)     Materials, parts or equipment furnished in connection with such work or operations.

      b.     Includes:

          (1)     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

          (2)     The providing of or failure to provide warnings or instructions.

(Hubbells' Mot. for Partial Summ. J., Ex. A-1, AmFam 0316-0319.)

The Policy also contains the following provision:

      6.     Representations

By accepting this policy, you [the insured] agrees:

      a.     The statements in the Declarations are accurate and complete;

      b.     Those statements are based upon representations you made to us; and

      c.     We have issued this policy in reliance upon your representations.

(Pl.'s Mot. for Summ. J., Ex. 2 at p. 14 at p. 17.)

The Policy does not include any kind of general exclusion for architectural services, engineering services, or drafting services. (*Id.*, Exs. 2 and 3.) The Policy also does not contain a definition for the term "accident". (*Id.*)

-13-

IV.    ANALYSIS

    A.    The Parties' Arguments in Their Motions

Plaintiff AmFam moves for summary judgment asserting that there are no genuine issues of material fact and that AmFam is entitled to judgment as a matter of law as to a declaration that it has no duties of defense or indemnification with regard to the underlying suit by the Hubbells.  Specifically, AmFam asserts that there is no potential coverage for, and thus no duty to defend (or to indemnify) these Defendants in the underlying action because:  (1) there is no "occurrence" triggering potential coverage; (2) the Hubbell's complaint does not allege covered "property damage"; (3) no property damage is alleged while Teamcorp was an insured under the policy; (4) AmFam's exclusions preclude coverage; and (5) the activities for which Teamcorp and Draft-Tek were sued are not within the scope of the risk insured.  Related to the last argument, AmFam argues that the Court should consider the application for the Policy.

AmFam also moves for summary judgment on the Counterclaims against it. AmFam asserts that upon granting the requested relief, all that would remain in the case is AmFam's affirmative claim for reimbursement of the defense fees and costs it has incurred under its reservation of rights.

The Teamcorp Defendants and the Hubbells both filed motions for partial summary judgment asking that the Court declare that AmFam has a duty to defend the Teamcorp Defendants.  They argue that the Teamcorp Defendants were covered as insureds under the CGL Policies issued by AmFam during a period of time when they were providing drafting and building services to the Hubbells.  They further argue that

-14-

the allegations of the Hubbells' Amended Third Party Complaint trigger a duty of defense under Colorado law.  Finally, the Teamcorp Defendants assert that the appropriate course of action is for AmFam to provide a defense under a reservation of rights or seek a declaratory judgment after the Hubbell action has been adjudicated.

      B.    <u>Summary Judgment Standard</u>

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Equal Employment Opportunity Comm. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

"When applying this standard, [the court must] 'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (quotation omitted).

"When the parties file cross motions for summary judgment, 'the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties,

but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Id.* (quotation omitted).  Cross motions for summary judgment must be treated separately–the denial of one does not require the grant of another.  *Buell Cabinet v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

      C.    <u>Whether Summary Judgment Should Be Granted Regarding the Duty to Defend</u>

      As detailed in my Order of February 10, 2009, "[t]he duty to defend pertains to the insurance company's duty to affirmatively defend its insured against pending claims." *Constitution Assocs. v. New Hampshire Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996).  The duty to indemnify, on the other hand, "relates to the company's duty to satisfy a judgment entered against the insured." *Id.*  The Colorado Supreme Court explained as to these two duties:

> The duty to defend is triggered more easily than is the duty to indemnify. Generally, the duty to defend arises where the alleged facts even potentially fall within the scope of coverage, but the duty to indemnify does not arise unless the policy actually covers the alleged harm. See *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089-90 (Colo.1991). Where there is no duty to defend, it follows that there can be no duty to indemnify. However, where there is a duty to defend, there is not necessarily a duty to indemnify.

*Id.*

      The issue before me in connection with the summary judgment motions is the duty to defend.  If I find that there is no duty to defend, there consequently will not be a duty to indemnify. *Constitution Assocs.*, 930 P.2d at 562.  However, if I find that there is a duty to defend, determination of the duty to indemnify is premature since the

underlying suit has not yet been resolved.  *Id.*  Where there is a duty to defend, there is

not necessarily a duty to indemnify.  *Id.*

As to the duty to defend, the Colorado Supreme Court has stated:

"an insurer seeking to avoid its duty to defend an insured bears a heavy
burden, as the duty to defend arises when the underlying complaint against
the insurer alleges any facts that might fall within the coverage of the policy.
'The actual liability of the insured to the claimant is not the criterion which
places upon the insurance company the obligation to defend.' Rather, the
obligation to defend arises from allegations in the complaint, which if
sustained, would impose a liability covered by the policy. 'W]here the insurer's
duty to defend is not apparent from the pleadings in the case against the
insured, but the allegations do state a claim which is potentially or arguably
within the policy coverage, or there is some doubt as to whether a theory of
recovery within the policy coverage has been pleaded, the insurer must
accept the defense of the claim.'"

*Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613-14 (Colo. 1999) (quoting *Hecla*

*Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991) (citations

omitted); *see also Gen. Security Indem. Co. v. Mountain States Mut. Cas.*, 205 P.3d

529, 532 (Colo. Ct. App. 2009).

To the extent that AmFam is asking me to make determinations of coverage in

connection with addressing the duty to defend, I address only whether the insureds

have shown "'that the underlying claim may fall within policy coverage", and whether

AmFam has proven that it cannot.  *Compass Ins. Co.*, 984 P.3d at 614 (quotation

omitted).  As further explained in *Compass* in the context of exclusions:

In order to avoid policy coverage, an insurer must establish that the
exemption claimed applies in the particular case, and that the exclusions
are not subject to any other reasonable interpretation. The insurer has a
duty to defend unless the insurer can establish that the allegations in the
complaint are solely and entirely within the exclusions in the insurance
policy. An insurer is not excused from its duty to defend unless there is no

factual or legal basis on which the insurer might eventually be held liable to indemnify the insured.

*Id.* at 614 (quoting *Hecla*, 811 P.2d at 1090).

I will not address whether coverage actually exists, as this must be determined in connection with the duty to indemnify. *Hecla Mining Co.*, 811 P.2d at 1089, 1092 (Colo. 1991). "Whether coverage is ultimately available under the contract is a question of fact to be decided by the trier of fact." *Id.* at 1089. I now turn to the specific issues raised by AmFam.

### 1.   Whether There Is An "Occurrence" as Required by the Policy

AmFam first argues that the case law interpreting standard CGL policies like the one at issue recognizes that mere faulty or non-complying work or products do not rise to the level of an "occurrence" or accident. I agree. However, that does not necessarily resolve the issue in this case, as discussed below.

The Colorado Court of Appeals recently addressed this issue in the *General Security Indemnity Company* case. There, a framing subcontractor's insurer brought a contribution and indemnification action against the sub-subcontractors' CGL insurers, seeking relief for the insurers' refusal to share in the costs in the defense of the framing subcontractor against a third-party complaint filed by the general contractor. *Gen. Sec. Indem. Co.*, 205 P.3d at 531-32. The trial court granted summary judgment in favor of the CGL insurers holding that they were not obligated to defend the framing subcontractor as a matter of law because the property damage was not caused by an "occurrence". *Id.* at 532. The Colorado Court of Appeals affirmed, holding in a matter

of first impression in a case involving tort and breach of warranty claims that damages arising from poor workmanship, standing alone, do not allege an accident that constitutes a covered occurrence in accord with the majority of jurisdictions that have considered the issue.  *Id.* at 534-35.

In so finding, the court analyzed the definition of an "accident" which is required to cause an occurrence.  It noted that since the word "accident" was not defined by the policies, as here, the "ordinary definition of 'accident'" should be applied to determine if the underlying complaint alleged an occurrence.  *Id.* at 533-34.  It also noted that courts had applied different definitions of the word "accident", and found that an accident involves some type of "fortuitous event".  *Id.* at 534-35.  In so finding, it rejected the minority rule that damage resulting from faulty workmanship was an occurrence so long as the insured did not intend the resulting damage because, among other things, it did not properly take into account that an accident must be fortuitous.  *Id.* at 535-36.

Finally, the court noted that "a corollary to the majority rule is that an 'accident' and 'occurrence' are present when consequential property damage has been inflicted upon a third party as a result of the insured activity."  *Id.* at 535; *see also Adair Group, Inc. v. St. Paul Fire and Marine Ins. Co.*, 477 F.3d 1186, 1187 (10th Cir. 2007) (applying Colorado law in determining that faulty workmanship in and of itself is not an event triggering application of an insurance policy but "additional damage that resulted from the faulty workmanship was deemed to be covered under the policies").

The Colorado Court of Appeals in the *General Security* case cited *Auto-Owners Ins. Co. v. Home Pride Cos.*, 684 N.W.2d 571 (Neb. 2004) in support of its opinion.  In

that case, the faulty installation of roof shingles caused additional consequential damage to the roof structures and other buildings which was sufficient to constitute an occurrence. *Id.* at 578-79; *see also American Employer's Ins. Co. v. Pinkard Constr. Co.*, 806 P.2d 954, 955-56 (Colo. Ct. App. 1990) (finding that there was an "occurrence" triggering coverage from installation of roof which began to corrode immediately upon its installation and later collapsed, as the progressive and continuous corrosion of the roof caused actual damages); *Colard v. American Family Mut. Ins. Co.*, 709 P.2d 11, (Colo. Ct. App. 1985) ("the unintended poor workmanship of Thone created an exposure to a continuous condition that resulted in property damage to plaintiffs. . . [h]ence, the damage here at issue was the result of an 'occurrence'").[3]

In the case at hand, I must broadly construe the term "occurrence" in favor of the insureds. *Pinkard Constr. Co.*, 806 P.2d at 955. Further, for purposes of AmFam's motion for summary judgment, I must construe the evidence in the light most favorable to the insureds. Under the above standard, I find that the underlying suit by the Hubbells does not merely allege poor workmanship in connection with the design of the plans and specifications, *i.e.,* that the plans were defective. It also can be read to allege consequential damages as a result of that workmanship.

---

[3] *Cf. American Mfrs. Mut. Ins. Co. v. Seco/Warwick Corp.*, 266 F. Supp. 2d 1259, 1266 (D. Colo. 2003) (no occurrence giving rise to coverage where furnaces installed by contractor did not perform to contract specifications and owner sought costs to modify furnaces to make them functional since this was merely the result of poor workmanship); *DCB Constr. Co., Inc. v. Travelers Indemnity Co.*, 225 F. Supp. 2d 1230, 1232 (D. Colo. 2002) (no occurrence triggering coverage where construction of hotel wall was performed exactly according to design and the completed walls were completely functional but they did not muffle sound to the contractually required specifications, causing owners to tear down walls; subcontractor was not guarantor of performance).

Specifically, the complaint refers to the fact that the Teamcorp Defendants not only designed the plans and specifications, they also "engineered the residence on the Property for the Hubbells." (Pl.'s Mot. for Summ. J., Ex. 1 ¶ 39.)  It also alleges that Draft-Tek entered into a contract in which it agreed to provide plans sufficient to construct the home.  (*Id.*, ¶ 57.)  Further, it alleges that the Hubbells hired an architect and professional engineer to inspect the property who concluded, among other things, that the residence had never been sited on the property, the structure significantly violated both Garfield County and subdivision height restrictions, the foundation had not been properly poured, and the residence would be structurally unsound and therefore uninhabitable if completed according to the plans.  (*Id.*, ¶¶ 35, 37.)  They also opined that corrective measures may not adequately remedy the many problems with the structure and that the entire structure needed to be demolished and rebuilt.  (*Id.*)  Finally, the complaint alleges that as a direct and proximate result of Draft-Tek's breach of contract, the Hubbells were damaged.  (*Id.*, ¶ 59.)

From the foregoing, I find that the allegations of the complaint can be construed to support a claim that the design of the plans and specifications was a cause, among others, of actual consequential damages to the entire structure that require it to be rebuilt.  Unlike the situation in *General Security Indemnity Company*, where "[t]here [were] no allegations that [the insured] was responsible for placement of the foundation, or for faulty workmanship that could have caused the foundation movement, or resulted in the interior floor cracking"), here the allegations can be read to support a claim that

the faulty plans and specifications prepared by the Teamcorp Defendants caused or contributed to the overall problems with the house.

Further, I agree with the Hubbells that the cases holding that "mere faulty work" do not constitute an "occurrence" may well not even be applicable.  The underlying complaint alleges that Teamcorp's faulty design and engineering work resulted in damage to the Hubbells' property, not that the Hubbells' damages consists solely of having paid for faulty plans.  In other words, the "property" at issue is the Hubbells' real property and partially constructed house, not the Teamcorp plans.

Accordingly, as a matter of law, I hold that AmFam is not excused from its duty to defend by operation of the "occurrence" requirement of the Policy.  *See Compass Ins. Co.*, 984 P.2d at 618.  AmFam's summary judgment motion is thus denied as to this issue.

> 2.      Whether the Underlying Complaint Alleges Covered "Property Damage"

AmFam next argues that the Hubbells' Amended Third-Party Complaint merely alleges defective plans and specifications prepared by Karnan and/or Teamcorp, and that  are no allegations that any property was actually damaged by their actions.  Again, I find that AmFam has not met its heavy burden of showing that it has no duty based on this issue.

The Policy defines "property damage" as either "*physical injury* to *tangible property, including all resulting loss of use* of that property" or "*loss of use of tangible property* that is not physically injured."  Here, the complaint arguably can be read to

support a claim that the alleged damage to the Hubbells' residence meets either part of the definition.

First, the injury to the Hubbell's house under construction could be construed to be a physical injury.  As detailed above, the underlying complaint alleges that the Hubbells entered into a contract with Draft-Tek for it to provide plans sufficient to construct the home.  Further, it provides that the Teamcorp Defendants provided the plans and specifications for the home and that damages resulted because "the structure significantly violated both Garfield County and subdivision height restrictions," the foundation was improperly poured and the structure was improperly located on the lot, that the residence if completed according to the plans would be structurally unsound and therefore uninhabitable, and that the entire structure needed to be torn down to due to these problems.  The complaint could thus be construed to support a claim that the Hubbells lost the use of this home and land because of "physical injury"– with salvage at best and demolition at worst of what is remaining of the house.  *See also Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 304 (Colo. 2003) (property damage includes economic losses resulting from loss of use of the property).

Further, even if there is not physical injury, the Hubbells' house under construction could be construed to be "tangible property".  In a CGL policy insurance dispute, the Colorado Court of Appeals defined "tangible property" as that which is capable of being handled, touched, or physically possessed.  *Lamar Truck Plaza, Inc. v. Sentry Ins.*, 757 P.2d 1143, 1144 (Colo. Ct. App. 1988).  The house under construction can be touched; it is made of cement, wood and other physical materials, and it can

also be physically possessed – there is only one and it cannot be exactly duplicated. Thus, even if the complaint could not be construed to allege physical injury, the Policy would still arguably provide coverage for loss of use of tangible property by the Hubbells.

AmFam argues, however, that because the allegations against Teamcorp and Karnan relate to the design of the project rather than the construction of the project that "[t]here are no allegations that Teamcorp or Karnan did anything at the project that harmed anything."  (Pl.'s Mot. for Summ. J. at 10-11.)  I reject this argument.  First, the complaint alleges that the fact that the Teamcorp Defendants "engineered the residence on the Property for the Hubbells."  This could be read to state a claim that the Teamcorp Defendants actually did something at the Project.

Second, I agree with the Hubbells that there is no requirement, either in the insuring agreement or in the definition of "property damage", that the property damage be the direct result of the insured's conduct.  Indeed, liability in Colorado generally requires only proximate cause, which can exist indirectly as one "link" in the chain of causation.  *See Nicholas v. North Colorado Med. Center, Inc.*, 902 P.2d 462, 471 (Colo. Ct. App. 1995) ("Colorado has never required an alleged cause to be the *sole* cause of the harm suffered. . . . [r]ather our jurisdiction has recognized that a number of acts may combined to cause an asserted injury"), *aff'd*, 914 P.2d 902 (Colo. 1996). Here it is undisputed that the Hubbells have alleged harm to, and loss of use of, their tangible property (i.e., "property damage'") as the result of the combined acts and

omissions of Teamcorp, Karnan, and Lincicome as design professionals as well as the other third party defendants.

Based on the foregoing, I hold that AmFam is not excused as a matter of law from its duty to defend by operation of the "property damage" requirement of the Policy. AmFam's summary judgment motion is thus denied as to this issue.

3.    Whether Property Damage is Alleged While Teamcorp is an Insured

AmFam argues that even if an "occurrence" and "property damage" are alleged that could trigger a duty to defend, there is still no coverage and thus no duty to defend because the underlying Amended Third-Party Complaint does not allege any property damage during the period when Teamcorp was insured under the AmFam policy. AmFam asserts that any such damage occurred at the latest by December of 2003 when work stopped on the project.  AmFam further asserts that Teamcorp did not become an insured under the Policy until May 13, 2004, when the name change endorsement to the Policy took effect.

I deny AmFam's summary judgment motion on this issue as well.  I agree with AmFam that under "occurrence" liability policies such as the one at issue, the trigger of coverage is the date when the alleged property damage occurred.  *Pinkard Const. Co.*, 806 P.2d at 956.  In other words "the time of the occurrence of an accident is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *Leprino v. Nationwide Prop. and Cas. Ins. Co.*, 89 P.3d 487, 490 (Colo. Ct. App. 2003); *see also Browder v. United States Fidel. & Guar. Co.*, 893 P.2d

132, 134 (Colo. 1995) ("a third party must suffer actual damage within the policy period [for the insured] to recover under a liability policy").

In this case, however, the complaint does not specify when the property damage actually occurred or when the Hubbells were actually damaged by the Teamcorp Defendants' actions.  It alleges that the construction of the Hubbell's home began in approximately May 2003, that "[i]n and around the last quarter of 2003, the Hubbells became concerned about the progress of the construction and the escalating costs.  There were problems with the plans and specifications. . . ." (Pl.'s Mot. for Summ. J., Ex. 1, ¶ 31).  It also alleges that the contract was terminated in December 2003 when an architect and professional engineer discovered numerous problems with the structure.  The complaint does not specifically mention any time period as to when the Teamcorp Defendants' alleged breaches and resulting damages occurred.  Further, the complaint can be construed to allege ongoing property damage.  Once the infrastructure was sited incorrectly and the uninhabitable structure impeded the use of the lot for its intended purpose, those conditions continued to exist and had to be corrected.

From the foregoing, although AmFam's duty to defend may not be "apparent from the pleadings", they "do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded."  *Hecla*, 811 P.2d at 1089.  Accordingly, "the insurer must accept the defense of the claim."  *Id*.

I also agree with the Hubbells that there may be an ambiguity in connection with who the original Named Insured was meant to be since "Laconia Homes, Inc." is a

nonentity and is a d/b/a of Teamcorp, Inc.  *See General Cas. Co. of Wis. v. Outdoor Concepts*, 667 N.W.2d 441, 445 (Minn. App. 2003) (concluding, in accord with other jurisdictions, that listing the named insured as a trade name or d/b/a results in an ambiguity).  "An 'insured' must be a legal 'person,' such as an individual, partnership, or corporation."  *Providence Washington Ins. Co. v. Valley Forge Ins. Co.*, 50 Cal. Rptr. 2d 192, 194 (Cal. Ct. App. 1996).  When such an ambiguity exists, all such ambiguities must be construed in favor of the insured and against the insurer.  *Hecla*, 811 P.2d at 1090-91.  In *Providence*, the court held that a policy issued with a "dba" as the named insured actually covered the user of the "dba" because the "dba" was not a separate legal or insurable entity, discussing numerous cases from other jurisdictions.  *See also Boling v. State Farm Mut. Auto. Ins. Co.*, 466 S.W.2d 696, 697-99 (Mo. 1971).

Under the above authority and construing the evidence in the light most favorable to the insured, since Laconia Homes is not a legal or insurable entity the actual Named Insured would be the user of the d/b/a, in this case Teamcorp, Inc. d/b/a Draft-Tek.  This would be true even before AmFam issued the endorsement which clarified that Laconia Homes was actually a "dba" of Teamcorp, Inc.  Further, the  complaint clearly alleges property damage that occurred while Laconia Homes was an insured, since it discusses damage that was discovered in 2003.

Further, AmFam has not shown that the endorsement correcting the identification of the Named Insured actually "expanded" coverage.  There was no increase in the number of insureds, which has always been one corporation.  The endorsement also did not alter any of the terms of insurance:  the insuring agreement is the same, the

exclusions are the same, and the policy limits are the same.  AmFam issued the policy to Teamcorp's "dba" and then issued the name change endorsement without ever changing any other terms of the policy to exclude coverage for any of Teamcorp's operations.  Construing the evidence in the light most favorable to the insureds, I find that this supports a theory or claim that AmFam intended from the beginning to insure Teamcorp.

Finally, since I find for purposes of the summary judgment motion that Teamcorp, Inc. is arguably an insured, I also find that Defendant Karnan may be an insured.  The Policy provides that executive officers and directors of the insured corporation are insureds, but only with respect to their duties as officers or directors.  The underlying complaint alleges that Karnan is an officer of Teamcorp, Inc. and the principal of Draft-Tek who participated in the design of the Hubbells' home.  Therefore, the complaint can be construed to mean that Karnan was sued in his capacity as an officer, making him an insured under the Policy for purposes of the underlying action.

In summary on this issue, I find that AmFam has not shown as a matter of law that Teamcorp and Karnan are not insureds under the Policy.  Accordingly, AmFam's summary judgment motion is also denied as to this issue.

### 4.    Whether AmFam's Cited Exclusions Preclude Coverage

AmFam also argues that the cited "business risk" exclusions j(5), j(6) and (m) would negate any coverage.  The Tenth Circuit has held that exclusion j(5) refers to "'property damage'" . . . occurring to real property during the course of the insured's work."  *Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1010 (10th

Cir. 2006).  In other words, it applies "whenever *property damage* 'arise[s] out of the work of the insured, its contractors, or its subcontractors while performing operations.'" *Id.* at 1011 (emphasis added) (quotation and internal quotation marks omitted). Exclusion j(6) applies whenever property damage "directly or consequentially occurs from the faulty workmanship of the insured and its contractors/subcontractors (i.e., work that 'was incorrectly performed'").  *Id.* at 1012.

Finally, this court construed the exclusion identical to AmFam's exclusion (m) in *DCB Const. Co.*, 225 F. Supp. 2d at 1233.  This exclusion "applies to 'damage to impaired property or property not physically injured,' and provides coverage is not contemplated for damage to property that is impaired or 'has not been physically injured arising out of .. [a] defect, deficiency, inadequacy or dangerous condition in your product or your work or ... [a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.'"  *Id.* (quotation and internal quotation marks omitted).  The Tenth Circuit construed this exclusion to bar coverage for claims based on construction of non-complying hotel room interior walls.  *Id.*

 I find that AmFam's summary judgment motion should also be denied on this ground.  AmFam does not provide any analysis whatsoever how the "business risk" exclusions it cites bar coverage.  The bare assertion that the exclusions apply does not come close to meeting AmFam's "very heavy" burden of proving the total application of an exclusion to bar any and all potential for coverage under the allegations of the underlying complaint.

In other words, I find that it has not been shown as a matter of law that the exclusions apply in this case.  The Policy's "property damage" exclusions j(5) and j(6) only apply if the insured or its contractors are performing operations or have performed work on the actual property that is damaged.  In this case, there are no allegations that Teamcorp or Karnan performed any such operations or work on the Hubbells' real property or on the partially completed structure.  Instead, the complaint alleges that these third-party defendants were involved in the design and engineering of the proposed home, not its construction.

Similarly, AmFam has not shown as a matter of law that the "impaired property" exclusion applies (exclusion m), both because the underlying Amended Third Party Complaint alleges damage to physical property other than Teamcorp's work product (the designs and specifications) and because the correction of Teamcorp's faulty plans will not eliminate the property damage already done.  Further, I previously found for purposes of the summary judgment motion that AmFam did not show that as a matter of law that there was no property damage, and this exclusion applies only to instances where property has not been physically injured.

Finally, the Policy does not contain any exclusions for architectural, engineering, or drafting services, even though the Named Insured endorsement references a "dba" called "Draftech".

Based on the foregoing, I find that AmFam has not shown as a matter of law "that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy", or that "there is no factual or legal basis on which the insurer might

eventually be held liable to indemnify the insured." *Compass*, 930 P.2d at .

Accordingly, I deny AmFam's summary judgment motion as to this issue.

5.   <u>Whether the Activities for which Teamcorp and Draft-Tek were<br>Sued Are Within the Scope of the Risk Insured</u>

Lastly, AmFam argues that Laconia Homes, Inc. contracted for, and obtained, general liability insurance covering its business operations only as a seller and builder of pre-manufactured homes.  While the Teamcorp Defendants were free to perform engineering work or create plans and specifications, AmFam asserts that any resulting liability claims for operations beyond the business description stated in the Declarations are not covered under the Policy.  AmFam asserts that the policy application expressly denied that the putative insured drew or provided plans, designs or specifications for others.  AmFam asserts that this is perhaps the argument most apropos to this case, and that the Court can properly consider the Application in this case despite the four-corners rule.

Again, I deny summary judgment on this argument.   The Policy Declarations page includes the "classifications" of the business activities as: "91583, Contractors-Subcontracted Work-In Connection With Building Construction, Reconstruction, Repair or Erection – One or Two Family Dwellings …."  AmFam has not shown as a matter of law that the short business description in the Common Declarations applies rather than the longer description in the Policy Declarations.  In other words, AmFam has pointed to nothing in the language of the Policy indicating that the short business description or premium classifications limit or exclude coverage.  Further, the language of these items

-31-

does not do so clearly, unambiguously, and completely as necessary to act as an exclusion and bar the duty to defend.

The language in the Policy Declarations is quite broad, listing the scope of the risk as "Contractors-Subcontracted Work-In Connection With Building Construction, Reconstruction, Repair or Erection – One or Two Family Dwellings." I find that the allegations of the complaint regarding the Teamcorp Defendants' work on the designs and specifications of the Property are at least potentially or arguably within the scope of the risk insured, as they relate to construction of a family dwelling. This is particularly true as the Policy does not exclude architectural services, engineering services, or drafting services for a single-family residence. While AmFam wants me to review the application for the Policy, I decline to do so as this is extrinsic evidence that I previously held would not be admitted.

6.   <u>Conclusion Regarding the Duty to Defend</u>

I find from the foregoing that American Family has not met its heavy burden of showing from the complaint allegations that it has no duty to defend. Plaintiff has not shown as a matter of law that coverage is excluded based on the complaint allegations. The allegations in the underlying complaint potentially trigger coverage under the terms of the insurance policy.

Because American Family has not satisfied its heavy burden, I find that its summary judgment motion must be denied. I further find that American Family has a duty to defend the Teamcorp Defendants in the underlying litigation, and grant the Teamcorp Defendants' Motion for Partial Summary Judgment Regarding Plaintiff's Duty

to Defend and the Hubbells' Motion for Partial Summary Judgment Re: American

Family's Duty to Defend Teamcorp, Inc. and Karnan.

      D.    <u>Whether AmFam is Entitled to Summary Judgment on the Teamcorp Defendants' Counterclaim</u>

AmFam also moved for summary judgment on Teamcorp and Karnan's

Counterclaims which seeks attorney fees and costs incurred in connection with the

defense of this action on the breach of contract claim and which seek a declaratory

judgment that AmFam owes them a duty of defense and indemnification.  I deny

summary judgment as to this argument as well.  Since I have found that AmFAm did not

meet its burden of showing it has a duty to defend, its argument that the Teamcorp and

Karnan's counterclaim for a declaratory judgment fails as a matter of law is rejected.

Moreover, I find that resolution of the Counterclaim for attorney fees and costs is

premature at this time.

V.    <u>CONCLUSION</u>

Based on the foregoing, American Family's summary judgment motion is denied.

The Teamcorp Defendants and the Hubbells' motions for partial summary judgment are

granted, as I find that AmFam has a duty to defend Teamcorp and Karnan in the

underlying lawsuit.  The allegations in the underlying complaint potentially trigger

coverage under the terms of the insurance policy.

Finally, I address the procedural posture of this case given my ruling.  The case is

currently set for trial commencing Monday, November 30, 2009, with a Final Trial

Preparation Conference set for Tuesday, November 17, 2009, at 3:00 p.m.   However, it

does not appear that this case is ready to go to trial.  The duty to indemnify is clearly premature as the underlying case has not yet been resolved, as is the counterclaim for attorney fees and costs incurred by the Teamcorp Defendants in connection with this action. Accordingly, I address whether this case should be stayed.

Judge Figa recognized in his October 16, 2007 Order that a stay in this case might become appropriate after the duty to defend was resolved.  I find, however, that this case could remain open for some time if the case is stayed given the posture of the underlying case.  Accordingly, I find that the better course is to vacate the trial and to administratively close the case pursuant to D.C.COLO.LCivR 41.2.  *See Quinn v. CGR*, 828 F.2d 1463, 1465 and n. 2 (10th Cir. 1987) (construing administrative closure as the practical equivalent of a stay).  The case may be reopened for good cause, which shall include the parties' representation in a motion to reopen this case that the underlying trial before Judge Arguello has been completed and that the parties intend to prosecute the duty to indemnify in this case.

It is therefore

ORDERED that Plaintiff's Motion for Summary Judgment (Doc. # 167) is **DENIED**.  It is

FURTHER ORDERED that Defendants Teamcorp. Inc. d/b/a Laconia Homes/ Draft-Tek and Kerry Karnan's Motion for Partial Summary Judgment Regarding Plaintiff's Duty to Defend (Doc. # 168) and the Hubbells' Motion for Partial Summary Judgment Re: American Family's Duty to Defend Teamcorp, Inc. and Karnan (Doc.

# 169) are **GRANTED** regarding American Family's duty to defend the underlying

lawsuit.   It is

FURTHER ORDERED that the five (5) day trial set to commence Monday,

November 30, 2009, and the Final Trial Preparation Conference set Tuesday,

November 17, 2009, at 3:00 p.m. are **VACATED**.  Finally, it is

ORDERED that this case is **ADMINISTRATIVELY CLOSED** pursuant to

D.C.COLO.LCivR 41.2, to be reopened for good cause shown as discussed in this

Order.

Dated:  September 22, 2009

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge